**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3074-17T2

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

TERRELL HAYWOOD,
a/k/a TERRELL DURANT,
TERREL HAYWOOD,
ZYON THAGGARED,

     Defendant-Appellant.

_____

Argued September 14, 2020 - Decided October 30, 2020

Before Judges Sabatino, Currier, and Gooden Brown.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment No. 17-05-1420.

Zachary G. Markarian, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Zachary G. Markarian, of counsel and on the briefs).

Lucille M. Rosano, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent (Theodore N. Stephens II, Acting Essex

County Prosecutor, attorney; Lucille M. Rosano, of counsel and on the brief).

PER CURIAM

Defendant Terrell Haywood appeals from his convictions and sentence following a jury trial. On the second day of trial, a juror informed the court that her daughter had visited her the prior evening wearing a sweatshirt bearing the image of the victim who the State alleged defendant had shot and killed. After questioning the juror about the occurrence, the court declined defendant's request to excuse the juror. After a careful review of the record and considering the juror's close relationship with her daughter and the circumstantial nature of the evidence against defendant, we conclude the incident had the clear capacity to influence the juror's partiality and it was error not to excuse her. On those grounds, we therefore vacate the convictions and sentence and remand for a new trial.

I.

On May 26, 2017, an Essex County grand jury indicted defendant for first-degree conspiracy to commit murder, N.J.S.A. 2C:5-2 and 2C:11-3(a)(1) (count one); first-degree murder, N.J.S.A. 2C:11-3(a)(1) (count two); second-degree unlawful possession of a handgun without a permit, N.J.S.A. 2C:39-5(b) (counts three and six); second-degree possession of a handgun for an unlawful purpose,

N.J.S.A. 2C:39-4(a) (count four); and second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1) (count five).[1]

A.

We derive the facts from the evidence presented at trial.  Around 12:30 p.m. on March 18, 2014, Queeson Mitchell was driving with his five-year-old son on Isabella Avenue in Newark.  Isabella Avenue is a one-way street in a residential neighborhood that intersects with Plymouth Street; the area was known for narcotics sales.

Queeson saw his friend, Kyrie Reynolds,[2] known to him as "Buckey," with six or seven other men near a vacant lot at 78 Isabella Avenue, about one house from the corner of Plymouth Street.  Queeson parked his pickup truck on the left side of the street in front of the lot where Kyrie was standing and went around to the passenger side – which faced the street – to take his son out of the truck. After he walked his son to the sidewalk, Queeson returned to the passenger side of his truck to pick up some belongings.

As Queeson stood at the side of his truck, he heard gunshots coming from the corner of Plymouth Street and Isabella Avenue and saw two men running

---

[1]  An unknown co-conspirator was listed under count one.

[2]  In some documents, Kyrie is also referred to as "Kharey."

down Isabella Avenue toward the group standing on the vacant lot. Queeson stated one man was running on the street and the other was running along the sidewalk on the other side of the street.

Queeson testified that the men had slender builds, were dressed all in black and wearing ninja-style ski masks exposing only their eyes. He observed one of the men was carrying a gun. Queeson heard "a lot" of "continuous" gunshots, estimating at least twenty shots. He believed both men were shooting because he heard two different guns being fired. Everyone ran.

Queeson was shot four times in the right upper arm and shoulder before he could run from the passenger side of his truck. The guns were still firing when Queeson stumbled and tripped over Kyrie, who was laying on the ground behind Queeson's truck, half on the sidewalk and half in the street. Queeson stated he "tried to get up" and run, but because of the injury to his right arm he fell again, landing next to Kyrie.

Queeson saw one of the men run around the side of his truck. The man stood directly over them with a black gun as he fired three or four times at Kyrie. The man looked at Queeson and then ran with the other man back toward Plymouth Street. Queeson did not see Kyrie with a gun.

A-3074-17T2

Once the assailants departed, the street "got crowded" as more people came outside to see what had happened. Kyrie's grandmother, who lived nearby, called 9-1-1 to report the shooting. Police officers responded and observed Kyrie lying in the street with gunshot wounds. They heard Queeson "screaming" and looking for his son. Queeson later learned that a man had grabbed his son when the shooting began and ran toward the backyard of a house to escape. The boy was not injured.

Emergency medical services responded and transported Kyrie and Queeson to the hospital. Kyrie was pronounced dead at 12:51 p.m. He had nine gunshot wounds. Two gunshots that penetrated the right side of the chest and the abdomen were fatal. Those bullets were recovered from the body. A third gunshot that penetrated the left buttocks was also recovered from the body.

Kyrie also suffered six perforating wounds to the upper and lower right thigh, left thigh, left elbow, left forearm and right buttocks. In addition, he had abrasions to the right knee, the back of the left hand, the right hand near the wrist and some bruises on the back of the chest.

Queeson suffered four gunshot wounds to his right upper arm. His humerus bone was severed from his shoulder and required surgery to remove the damaged bone and insert a cadaver bone as well as metal rods and rings. He

underwent numerous additional surgeries and testified he did not have "full function" of his arm, could not perform physical work, lost his job as a landscaper, and had permanent scars.

Detective Murad Muhammad of the Newark Police Department (NPD) Homicide Task Force and Detective Rashon Johnson of the Essex County Prosecutor's Office (ECPO) Homicide Task Force took formal statements from Queeson and his son at the hospital. Queeson described the man who shot Kyrie as five feet, eight inches tall, 175 to 180 pounds, wearing all black clothing and a mask. He thought the shooter may have had braids or dreadlocks because the top of his mask was a "little puffy." Queeson could not describe the other assailant other than he was also dressed in black and wearing a mask. Because Queeson only observed the second man as he was running away, he could not tell if he was carrying a gun.

Around 1:00 p.m., after the hospital visit, Muhammad went to Isabella Avenue with other officers to search for evidence there and on Plymouth Street. He observed thirty or more spent shell casings on the ground. The shell casings were on the sidewalk and east and west sides of Isabella Avenue. Two vehicles had been hit by gunshots.

Detectives from the ECPO Crime Scene Unit arrived at the scene around 1:25 p.m. Thirty-eight spent shell casings, one live (whole) bullet and fifteen whole or fragmented spent projectiles were collected. The fifteen spent projectiles were found in and around 74, 77, 80, and 85 Isabella Avenue and inside the two cars.

The officers went door-to-door on Isabella Avenue and Plymouth Street to attain additional information. Some residents stated they heard gunshots or saw Kyrie on the ground after the shooting, but no one was able to identify the shooters.

Muhammad described for the jury his review of the chronology of 9-1-1 calls about the shooting. The first call reporting the shooting was received at 12:28:47 p.m. Muhammad spoke to two callers listed in the chronology, but they only heard shots fired. No one saw the shooting or could identify the assailants.

B.

Five weeks after the shooting, on April 26, 2014, Detective Hugo Rebiero with the Gangs and Organized Crime Unit of the New Jersey State Police (NJSP) and two detectives with the ECPO Crimes Suppression North Unit[3] were

---

[3] The two other detectives with Rebiero did not testify at trial.

patrolling a Newark neighborhood in an unmarked vehicle. The officers were dressed in civilian clothes and tactical vests identifying them as "State Police."

While on patrol, the officers saw defendant walking on the street to the left of the officers' vehicle. Defendant was wearing sweatpants and an open black vest over a dark gray jacket. Rebiero stated he observed a "big bulge" in defendant's right jacket pocket that "was consistent with . . . a gun." As defendant crossed the street behind the officers' vehicle, Rebiero turned around in his seat, looked through the back window and saw the "black handle of a handgun" protruding from defendant's jacket pocket.

The officers stopped defendant on the sidewalk and Rebiero removed a handgun – a Springfield Armory 45-caliber semi-automatic – from defendant's right jacket pocket. The gun's magazine contained nine live rounds. The detectives also took defendant's cellphone.

The detectives arrested defendant and handcuffed him. While the officers waited for backup, defendant sat down on the curb and Rebiero read defendant his Miranda[4] rights. Defendant remained silent.

En route to police headquarters, defendant sat in the backseat of the vehicle next to Rebiero. When defendant asked Rebiero if he was going to jail,

---

[4] Miranda v. Arizona, 384 U.S. 436 (1966).

A-3074-17T2

Rebiero told him he was. Rebiero then read defendant his <u>Miranda</u> rights for the second time because defendant "initiated [the] conversation regarding the case."

Defendant then asked if the officers could "get rid of the gun." Rebiero believed defendant was asking them to "[g]et rid of the charges and not charge him." Rebiero told defendant they could not do that and then asked how long defendant had possessed the gun and who gave it to him. Rebiero testified that defendant said he had been shot in the arm in January and got the gun afterwards from an unnamed deceased associate to "protect himself."

The arrest report, prepared and filed by Rebiero later that day, did not include the second reading of defendant's <u>Miranda</u> rights or defendant's request for the officers to "get rid of the gun." Rebiero explained he did not include the information because he did not know, at the time, that the gun would be connected later to a homicide investigation after ballistics testing.

When asked on cross-examination why he and the other two officers did not electronically record or contemporaneously transcribe Rebiero's questions and defendant's answers given while driving to headquarters, Rebiero stated "[i]t wasn't really practical at the time[]" because he was in the back of the car. In

addition, the vehicle was not equipped with an "MVR"[5] and the officers were not wearing body cameras.

Defendant moved to suppress the statements made to Rebiero on April 26, 2014, arguing the State had not shown he had waived his Miranda rights. The trial judge denied defendant's motion, finding the statements were voluntarily made after defendant was advised of his rights.

## C.

A total of thirty-eight shell casings and one PMC El Dorado 45-caliber automatic live round were recovered from Isabella Avenue after the shooting. A detective from the NPD Ballistics Laboratory testified as a ballistics expert. He determined the shell casings and live round were deposited at the scene around the same time but did not know how long the items had been there before they were collected as evidence.

The ballistics expert concluded that the recovered shell casings and projectiles were fired from four weapons. A search in the ballistics identification system revealed that two of the casings matched the gun seized from defendant. No fingerprints were found on the handgun. The other thirty-

---

[5] MVR is an abbreviation for a motor vehicle recording. State v. Mandel, 455 N.J. Super. 109, 112 (App. Div. 2018).

six shell casings recovered from the scene were fired from three different weapons. The three bullets recovered from Kyrie's body were not fired from the gun seized from defendant; they were fired from another 45-caliber weapon.

D.

During defendant's arrest, officers seized his cellphone. In April 2014, a ECPO Detective extracted data from defendant's cellphone and prepared a 726-page report listing all of the extracted text messages. For context, the first 9-1-1 call regarding the shooting was made at 12:28:47 p.m.

The cellphone data revealed defendant sent a text message on March 18, 2014 at 12:31:11 p.m. to someone named "Bruskie," which read: "Nigga with blue coat done." Kyrie was wearing a blue North Face jacket at the time of his death.

Cellphone records also showed three phone calls between defendant and Bruskie near the time of the shooting: Bruskie to defendant at 12:07 p.m.; defendant to Bruskie at 12:18 p.m.; and Bruskie to defendant at 12:24:04 p.m. Although police obtained a search warrant for the subscriber information associated with Bruskie's cell number, they were unable to identify the subscriber.

In addition, an unknown person either called defendant or received a call from defendant at 12:27 p.m. Another unknown person called defendant at 12:34:54 p.m. for 346 seconds; defense counsel represented the call came from the Essex County Juvenile Detention Center.

E.

Defendant's girlfriend, Geovana Baltimore, lived on Brookdale Avenue in March 2014. Defendant stayed at her residence most nights. Baltimore's house was two blocks from the McDonald's on 18th Avenue, three blocks from Isabella Avenue and half a block from South Orange Avenue. Defendant's grandmother and uncle lived on Grove Street in Irvington, one block behind the Garden State Parkway, in the neighborhood of Isabella Avenue. Defendant received his mail at this address.

Baltimore recalled meeting with police officers in June 2014 where she reviewed cellphone records and answered questions regarding her and defendant's respective cellphones. The records pertaining to her cellphone number reflected a series of text messages between Baltimore and defendant on March 18, 2014 spanning from 2:00 p.m. to just before midnight. Baltimore testified that defendant was not at her house that night.

A-3074-17T2

The State produced Meghan Smith who testified she had known defendant for about six years, called him "Rel" and had purchased heroin from him on "a regular basis," or "as often as [she] could," for "[a] couple of years at least."

On March 18, 2014, Smith stated she texted and called defendant from her boyfriend's cellphone to arrange a meeting to buy heroin that day. They often met at the McDonald's restaurant on 18th Avenue, and Smith recalled arranging to meet defendant that day in the "late morning, early afternoon[,]" "around lunch time." The McDonald's was near West End Avenue and South Orange Avenue. 18th Avenue intersected with Isabella Avenue.

Smith described seeing defendant walk into the McDonald's alone and wearing "dark gray, almost black, all dark" ski pants, a jacket with a hood and a black knit hat. She did not know "how he got there" and she did not see where he went after he left the restaurant. She thought it was around "lunchtime" and stated the exchange took "no more than five minutes."

Smith stated she was "almost in constant contact" with defendant prior to their meeting. She confirmed the following series of text messages were sent between them: Smith to defendant at 10:52 a.m. asking for "three buns";[6]

_____

[6] Buns is short for bundles of heroin. Each bundle had ten individual envelopes.

defendant to Smith at 10:54 a.m. asking when Smith wanted to meet; Smith to defendant at 11:00 a.m. stating she was about eight minutes away; defendant to Smith at 11:01 a.m. telling her to hurry; Smith to defendant at 11:02 a.m. stating she was on her way; defendant to Smith at 11:09 a.m. asking her where she was; defendant to Smith at 11:22 a.m. asking again where she was; Smith to defendant at 11:40 a.m. telling him she had the money and asking him where he wanted to meet; defendant to Smith at 11:46 a.m. telling her to meet him at the "[s]ame spot"; Smith to defendant at 12:16:08 p.m. asking where he was; defendant to Smith at 12:16 p.m. stating he was at McDonald's; Smith to defendant at 12:17 p.m. asking if it was "cool there"; Smith to defendant at 12:39 p.m. stating she would be there in about ten minutes; and defendant to Smith stating "I'm waiting" at 12:42:41 p.m.

The following phone calls were also made: defendant to Smith at 11:46 a.m. lasting five seconds; Smith to defendant at 12:23:19 p.m. lasting for ninety-seven seconds; defendant to Smith at 12:41:57 p.m. lasting for two seconds; defendant to Smith at 12:42:16 p.m. lasting for one second; and Smith to defendant at 12:42:53 p.m. lasting for sixty-two seconds. Smith recalled that she probably placed the last call to defendant when she arrived at the McDonald's.

In sum, the following phone calls occurred: defendant to Smith at 11:46 a.m.; Smith to defendant at 12:23:19 p.m.; Bruskie to defendant at 12:24:04 p.m.; call to or from unknown caller at 12:27 p.m.; call to defendant at 12:35:54 p.m., from the Essex County Juvenile Detention Center; defendant to Smith at 12:41:57 p.m.; defendant to Smith at 12:42:16 p.m.; and Smith to defendant at 12:42:53 p.m.

## G.

The State offered Special Agent Ajid David, a member of the Federal Bureau of Investigation's (FBI) Cellular Analysis Survey Team (CAST), as an expert in historical cell site analysis. David authored a report in October 2015 regarding the historical cell site analysis and drive test he conducted for this case. In her opening statement, the assistant prosecutor informed the jury she intended to produce David as an expert.

During defense counsel's cross-examination of David on his qualifications, the trial judge called counsel to sidebar and the following colloquy ensued:

> THE COURT: It sounds to me more like cross[-] examination.
>
> [DEFENSE COUNSEL]: Well --

15

THE COURT: As to the context as opposed to the voir dire as to his expertise.

[DEFENSE COUNSEL]: It is a field in which he claims to be and [sic] expert and these questions, really, they could be asked on cross but they, also, mind the extent of his so[-]called expertise. But I will be guided by the [c]ourt.

THE COURT: I don't think so. I'm going to ask you to please conclude and move on. Take all the time you want to cross[-]examine.

[DEFENSE COUNSEL]: Okay. The only other thing for the record I wanted to mention do you intend to ask Agent David about drive testing?

[PROSECUTOR]: Yes.

[DEFENSE COUNSEL]: Okay. It's my understanding that the issue of the admissibility of cell site analysis has not yet been decided by our Appellate [c]ourt. There is a case pending now. The question of the admissibility of this type of expertise is open and I'm not going to object to this witness at least being an expert and testifying in the area. I do object to him testifying about drive tests. It . . . just for the record a drive test is when he drives around and does it some time much later under different circumstances and has an opinion about the range of the towers in question. This is not a settled science. It's not a repeatable science. And just for the record if the State attempts to do it I object to that type of expert testimony.

THE COURT: Well, isn't this something that should have been brought to the [c]ourt's attention long before now so we all could have addressed the issue and we all could have been –

16

[DEFENSE COUNSEL]: Yes.

THE COURT: -- prepared to argue and/or make a ruling?

[DEFENSE COUNSEL]: Yes. I read about it over the weekend. The drive testing. I was reminded from the report. Again, I'll be guided by the [c]ourt's thoughts in this regard.

THE COURT: Well, as far as additional voir dire as to his qualifications I'm going to cut you off now. I think you've gone into his qualifications but, then, there's enough to determine whether or not you want to object or not object to this person being admitted as an expert. As far as anything else I'm going to take it as it comes.

[DEFENSE COUNSEL]: Okay, thank you.

David conducted a historical cell site analysis and a drive test to determine whether defendant's cellphone was used in the general area of the shooting at the approximate time of the crime. He explained that the cell site analysis only shows the cellphone's possible location, whereas the drive test provides the phone's probable location.

David provided the jury with detailed information explaining how he performed the cell site analysis. We need not repeat the comprehensive testimony as defendant does not contest the validity of the cell site analysis.

In short, David examined call detail records provided by the ECPO that spanned four weeks before the shooting and two weeks after. In comparing them to cell tower records, he then mapped the general location of defendant's phone around the time of the shooting. In 2014, defendant's cellphone carrier – T-Mobile – kept call detail records for voice calls, text messages and data usage. Cell site usage, however, was only available for voice calls and some data calls, but not for text message usage. This meant defendant's text messages could not be translated into calling events on a map for the historical cell site analysis. Therefore, David's historical cell site analysis was based only on voice calls.

David informed the jury he generated a report documenting the location of defendant's cellphone on March 18, 2014, between 11:46:42 a.m. and 12:42:53 p.m., by mapping the tower sectors to which the cellphone connected. The data was translated onto physical maps that depicted every cell tower defendant's cellphone communicated with between 11:46:42 a.m. and 12:42:53 p.m. The map showed calls were made in the vicinity of defendant's grandmother's address and 80 Isabella Avenue – the two addresses David used when conducting the analysis.

David showed the jury maps depicting the chronological progression of defendant's cellphone through cell tower sectors from 11:46 a.m. to 12:42 p.m.

A-3074-17T2

The map time-stamped 11:46 a.m. showed defendant's cellphone hitting a cell tower near the Parkway. The map time-stamped 12:07 p.m. showed defendant's cellphone hitting a cell tower in Newark, north of the previous tower.

The maps time-stamped 12:18, 12:22, 12:23, and 12:24 p.m. showed defendant's phone was using the north and south sectors of the same tower located along 18th Avenue and the intersection with Isabella Avenue. For the reader's reference, at 12:23 p.m., Smith called defendant. At 12:24 p.m., Bruskie called defendant.

The map time-stamped 12:27 p.m. showed defendant's phone hitting a tower along South Orange Avenue near the Vailsburg section of Newark, north of the 18th Avenue/Isabella Avenue tower. As stated, an unknown person either called defendant or received a call from defendant at 12:27 p.m.

The map time-stamped 12:35 and 12:41 p.m. showed the phone hitting a tower along Interstate 78 (I-78), in the Weequahic section of Newark, further south of the previous tower. The map time-stamped 12:42 p.m. showed the cellphone hitting a tower just north of I-78 in Newark, generally southwest of the previous tower.

The map time-stamped 12:42 p.m. showed the cellphone hitting a tower along Clinton Avenue in Newark, southeast of the previous tower.

David explained to the jury that historical cell site analysis "approximate[s] a . . . reasonable coverage area for [a] particular tower and sector." The expert clarified that although he could show a cellphone communicated within the area of the sector of a tower on a particular date and time, he "[could not] say specifically that [a cellphone] was at a particular address. Only that it's consistent with it being at that address."

Because David was informed the specific location of defendant's cellphone was important to this case, he also conducted a drive test to establish the probable location of defendant's cellphone at the time of the shooting by determining the frequency strength and range of the two cellphone towers near the crime scene. Contrasting a drive test with historical cell site analysis, David explained "[a] drive test is not just an estimation of a particular cell site's coverage[;] it is a true mapping of what the cell site's coverage is[,]" meaning a more "accurate mapping . . . ."

The expert then explained to the jury how the test was done. A vehicle-mounted scanner – which was used by cellphone carriers – "reads all the frequencies and channels [that were] being broadcast throughout the [T-Mobile] network" and "identif[ies] which areas [were] dominant . . . [or] just usable in a particular area." The data that is collected by the scanner is then downloaded

20

into software and a map is created depicting the "true" signal strength coverage for the relevant towers.

David performed a drive test for the two towers near the crime scene in August 2015, one year and five months after the shooting. The "goal" of the drive test is "to preserve the network conditions as they were on the day of the event . . . ." David explained a drive test should, therefore, generally be conducted no more than a year and a half after an incident has occurred.

Before conducting the test, David examined the tower list and reviewed the tower orientation for any changes to ensure the network was fundamentally the same as it was when the crime occurred. He explained the cell sites, antennae heights and orientations for the towers must be the same as they were at the time of the crime to conduct the analysis. He concluded he was able to perform the drive test because the cell sites, antennae heights and orientations for the cell towers had not changed.

David's drive test focused on the two cellphone towers around the crime scene and the three calls occurring at 12:23, 12:24 and 12:27 p.m. In addition to those sites, David drove the scanner around the surrounding towers to ensure accurate mapping.

21

From the drive test data, David produced a map with shaded areas illustrating the scanner's readings of the "domina[nt] coverage" area of the towers. The dominant coverage area depicts the range in which a cellphone would "most likely" connect to a particular tower and sector and, therefore, "where [a cell] phone most likely was located as opposed to possibly located." David conceded signal strength and topography can affect a cell tower's coverage.

Although David stated he believed the scanner was capable of providing a "very good depiction of what the true coverage actually is . . . for [the] two [relevant] sectors" in this case, he recognized there were some limitations to the drive test, including that he could only drive down streets and had to use software to measure areas inaccessible by vehicles, such as nearby parks.

Consequently, the scanner measures signal strength while driving down each street and, utilizing an algorithm that is widely-used in the telecommunications industry, "interpolate[s]" the outer bounds of the signal coverage between streets at the edge of the coverage area and in inaccessible areas like Vailsburg Park. The drive test took six to seven hours to conduct.

Based on the drive test, David found the dominant coverage area was from the cell tower and site along 18th Avenue and the 12:23 and 12:24 p.m. calls

probably occurred within that area. The 12:27 p.m. call probably came from the dominant coverage area from the cell tower along South Orange Avenue.

On cross-examination, David testified that it was also "possible" that the 12:27 p.m. call fell outside the dominant call areas. He was also unaware whether there were any buildings that had gone up or come down in the area of the drive test in the timeframe between the crime and the drive test that might have affected the signal strength.

H.

On the second day of trial, November 30, 2017, the judge advised counsel that Juror Two had left a message on his voicemail the prior evening, indicating she had "inadvertently" received some information about the case. After excusing the jury, the judge questioned Juror Two in the presence of counsel at sidebar.

The juror stated her twenty-eight-year-old daughter came to her house the prior evening wearing a memorial sweatshirt on which was imprinted a photograph of a light-skinned African-American man and the words "R.I.P. Buckey."

The juror said it was the first time she had seen her daughter since her jury service began and she had not told her daughter what type of case she was

23

serving on. The juror said her daughter had her own residence in Newark and they did not live together. She did not know her daughter's male friends or whether her daughter knew any members of defendant's family. The juror stated she had never seen her daughter wear the sweatshirt before. The juror did not make any comment about the sweatshirt, nor did her daughter and she did not think her daughter saw her looking at the shirt. The juror did not tell her daughter she was a juror sitting on Buckey's case and she said she did not discuss the incident with anyone else, including the other jurors.

The judge instructed Juror Two not to discuss the matter with the other jurors and let her go out with the other jurors on a recess. Defense counsel argued Juror Two should be excused because "[i]t appear[ed] that her daughter must know the trial has begun and knows her mother's a juror and wore the sweatshirt at the house. There's just too many coincidences here." The prosecutor disagreed, arguing against the juror's excusal because the juror's daughter only knew her mother was on jury duty but did not know what type of case she was hearing, and the juror was "very careful" not to divulge any information.

Defense counsel also asserted he would have used one of his peremptory challenges and asked the court to excuse Juror Two had he known during jury

selection that her daughter had come to the house wearing the sweatshirt bearing the victim's name and likeness. Counsel stated "no criminal defense trial lawyer would ever let a juror remain [on the jury] who has this type of relationship or his family member had this type of relationship with the decedent [or] the decedent's friends and family" and his motion "ha[d] nothing to do with the juror's good faith or bad faith or . . . the timing."

The prosecutor suggested the judge ask the juror some additional questions to determine if the incident had affected her ability to be fair and impartial. The court agreed.

The transcript of the second voir dire of Juror Two at sidebar denotes significant portions as inaudible. However, we can glean from the transcript that Juror Two remembered the questions asked of her during jury selection regarding whether she could remain impartial and whether there was anything that would affect her ability to be impartial; she stated she could remain impartial despite seeing her daughter's sweatshirt; she had not discussed the matter with any other jurors; she was "sure" she would be seeing her daughter again during the trial; she did not believe someone "with knowledge" that she was a juror on the case encouraged her daughter to wear the sweatshirt; she had never seen the sweatshirt or her daughter wear a memorial sweatshirt before;

25

she had never heard the victim's name before the trial; and her relationship with her daughter would not be affected if the juror found defendant not guilty and her daughter learned of her decision.

After Juror Two left the courtroom, defense counsel reiterated his motion to excuse her. It appears the judge advised he would take the matter under consideration and give a decision at a later time. The trial continued through the remainder of that day with the State presenting three additional witnesses.

The following week, on the next day of trial, December 5, 2017, the trial court denied defendant's motion to excuse Juror Two, stating:

> After extensive questioning at sidebar with both the [c]ourt and counsel[,] I find [absolutely] no basis for dismissing her from this jury.
>
> Having had the opportunity to question her at sidebar again, as well as observe her demeanor while being questioned[,] I am satisfied that she has not been tainted by her daughter's wearing a sweatshirt bearing the victim's image, name, in quotes, "Buckey," close quotes, as well as the inscription, in quotes, "RIP."
>
> [Juror Two] credibly testified that she had no discussions with her daughter concerning the sweatshirt or any possible relationship with the victim or the incident. And when asked several times by both the [c]ourt and counsel whether she still could be fair and impartial and decide this case solely on the evidence presented in the courtroom[,] she without hesitation responded, yes. Even when asked by the [c]ourt, even though it appears that your daughter apparently has

some strong feelings about the victim, again, without hesitation she responded, yes, that she could be fair and impartial.

Based on all of the aforementioned again, I am satisfied that [Juror Two] can be fair and impartial and decide this case solely on the evidence presented in this courtroom.

And for all of those reasons[,] I find no cause to dismiss her from the jury.

Juror Two deliberated and reached a verdict on the case.

## I.

During the trial, Detective Muhammad testified to his involvement in the investigation of the shooting. He stated that, before he went to the crime scene, he took formal statements from Queeson and his son at the hospital during which they provided descriptions of the suspects.

When the prosecutor asked Muhammad how Queeson had described the suspects, defense counsel objected on the grounds of hearsay. The following colloquy occurred:

> [DEFENSE COUNSEL]: The question and the answer . . . elicits a hearsay testimony. The testimony of someone else. He can say what he did, what he did next, or what he did as a result of that information. But he can't testify, I submit, most respectfully, to what people told him.

THE COURT: If it's not offered for the truth[,] he certainly can.

[DEFENSE COUNSEL]: What is it offered for if not that it's the truth?

[PROSECUTOR]: How they conducted the investigation.

THE COURT: And how -- overruled, I'll permit it.

Thereafter, Muhammad testified that Queeson had described the two shooters as tall black males, wearing dark clothing with scarves and masks covering their faces. He said that Queeson's son gave the same description. Neither Queeson nor his son could identify the shooters.

The following month, on April 28, a supervisor from the Newark Ballistics Department informed Muhammad that defendant had been arrested, and police had seized from him a weapon that was identified as the gun used to kill Kyrie. Muhammad learned from the "arresting detectives" that defendant told them he had possessed the weapon "[s]ince January before the murder of Kyrie . . . up until the incident of Kyrie . . . ." Defendant further stated to the arresting officers that he had the gun "[f]or his protection . . . [because] he had been shot." There was no objection to his testimony. Muhammad learned from police records that defendant had been shot on January 29, 2012 – two years before the shooting of Kyrie and Queeson.

Muhammad further advised the jury he had reviewed the extraction report of defendant's cellphone. He found defendant's text message to Bruskie "significant" to the investigation "[b]ecause of the time and, also, the victim was wearing a blue coat when he was shot."

J.

During his closing argument, defense counsel relied on a theme of justice and used the symbol of the "scales of justice" while explaining the State's burden of proof and the presumption of innocence. He also stated this country did not recognize "hand me down justice" and that everyone was "guaranteed justice."

In her summation, the assistant prosecutor stated: "You hear about cases where things happen, no one's ever apprehended. Well, that's what the defendant and his co-conspirator tried to do . . . . They tried to leave Kyrie Reynolds, his family without justice."

"And I submit to you that . . . gives you the opportunity to provide justice in this case. Provide justice to Kyrie Reynolds and his family and Queeson Mitchell who was shot as a result."

"That's your responsibility, ladies and gentlemen, to find justice in this case."

> And [defense counsel] went through the scales of
> justice, the bringing up and the other one crashing

29

> down. I submit to you, ladies and gentlemen, the State has proved to you beyond a reasonable doubt each and every offense that's listed in the indictment. And I submit to you that when you look at all the evidence, you remember all the testimony that was presented to you, you will find the defendant guilty of all charges.

Defense counsel did not object.

## K.

Defendant was convicted on all counts. During the sentencing hearing, defense counsel did not argue for the imposition of any mitigating factors.

The judge found aggravating factors one, N.J.S.A. 2C:44-1(a)(1) (nature and circumstances of the offenses); three, N.J.S.A. 2C:44-1(a)(3) (risk that defendant will commit another offense); six, N.J.S.A. 2C:44-1(a)(6) (extent of defendant's prior criminal record and the seriousness of the offenses for which he has been convicted); and nine, N.J.S.A. 2C:44-1(a)(9) (need to deter defendant and others from violating the law). The judge found no mitigating factors and determined the aggravating factors "far outweigh[ed]" the non-existent mitigating factors.

The judge also held defendant was eligible for an extended term as a persistent offender because he had four prior convictions within ten years of the present offense while over the age of twenty-one. See N.J.S.A. 2C:44-3(a). Defendant does not appeal this aspect of the sentence.

In addition, the judge imposed consecutive sentences on counts two, five and six reasoning:

> Now, in addition to the findings placed on the record[,] I also need to place on the record the following: The [c]ourt's reason for the consecutive sentences imposed, I find that pursuant to [State v. Yarbough[7]], specifically the guidelines contained therein, as well as the philosophy of that case and that there should be no free crimes in a system . . . where the punishment fits the crime.
>
> The aggravated assault of Queeson was a separate and distinct act of violence resulting from a complete disregard for the safety of innocent people . . . . Defendant's actions involved two specific victims, [Kyrie] as well as [Queeson].
>
> I also find that the unlawful possession of a weapon charge of April 26th, 2014 is also a separate and distinct crime or act wholly independent of and unrelated to the incident that occurred on March 18th, 2014. Reasons why the [c]ourt elected to impose consecutive sentences on [defendant].

Defendant was sentenced to life imprisonment with an eighty-five percent parole disqualifier pursuant to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, on count two; a ten-year imprisonment term, with a five-year parole disqualifier on count three to run concurrently with the murder sentence; an extended term of fifteen years imprisonment, subject to NERA, on count five,

---

[7]  State v. Yarbough, 100 N.J. 627 (1985).

to run consecutively to the murder sentence; and a ten-year imprisonment term with a five-year parole disqualifier on count six to run consecutively to the murder and aggravated assault sentences for the unlawful possession of a weapon conviction.

## II.

Defendant raises the following issues on appeal:

POINT I

[DEFENDANT] WAS DENIED AN IMPARTIAL JURY BECAUSE THE COURT REFUSED TO EXCUSE A JUROR WHOSE DAUGHTER VISITED HER HOME ON THE FIRST DAY OF TRIAL WEARING A SWEATSHIRT MEMORIALIZING THE VICTIM

The Trial Court Violated [Defendant's] Right to an Impartial Jury by Refusing to Excuse Juror Two, Whose Interaction with Her Daughter During Trial Had the Capacity to Influence Her

The Trial Court Denied [Defendant] His Right to an Impartial Jury by Refusing to Excuse Juror Two Despite Defense Counsel's Assertion that He Would Have Exercised a Peremptory Challenge Against Her During Voir Dire Had He Known of Her Daughter's Connection to the Victim

POINT II

THE TRIAL COURT FAILED TO PERFORM ITS GATEKEEPING FUNCTION BY OVERRULING DEFENSE COUNSEL'S OBJECTION TO THE

A-3074-17T2

ADMISSION OF EXPERT TESTIMONY REGARDING DRIVE TESTING WITHOUT HOLDING A 104 HEARING TO ESTABLISH ITS RELIABILITY

POINT III

[DEFENDANT] WAS DEPRIVED OF A FAIR TRIAL BECAUSE THE TRIAL COURT DID NOT CHARGE THE JURY REGARDING THE ARRESTING OFFICERS' FAILURE TO RECORD HIS ALLEGED STATEMENT MADE DURING CUSTODIAL INTERROGATION AND PERMITTED HEARSAY TESTIMONY FROM AN OFFICER WHO WAS NOT PRESENT DURING THE INTERROGATION TO CORROBORATE THE ALLEGED STATEMENT (NOT RAISED BELOW)

The Trial Court Should Have Charged the Jury Regarding Officers' Failure to Record Their Questioning of [Defendant]

Detective R[e]biero's Account of the Unrecorded Interrogation Was Impermissibly Bolstered by Hearsay Testimony from Detective Muhamm[a]d, Which Violated [Defendant's] Right to Confrontation

POINT IV

THE PROSECUTOR ELICITED IMPERMISSIBLE HEARSAY TESTIMONY FROM DETECTIVE MUHAMM[A]D REGARDING EYEWITNESSES' DESCRIPTIONS OF THE SHOOTERS, IN VIOLATION OF [DEFENDANT'S] RIGHT TO CONFRONTATION

POINT V

THE PROSECUTOR MADE AN IMPROPER CALL TO ARMS IN SUMMATION THAT DENIED [DEFENDANT] HIS RIGHT TO A FAIR TRIAL (NOT RAISED BELOW)

POINT VI

THE CUMULATIVE EFFECT OF THE AFOREMENTIONED ERRORS DENIED [DEFENDANT] A FAIR TRIAL

POINT VII

DEFENDANT'S SENTENCE IS EXCESSIVE BECAUSE THE COURT FAILED TO ADEQUATELY FIND AND WEIGH THE FACTORS AND DID NOT EXPLAIN ITS REASONS FOR IMPOSING CONSECUTIVE SENTENCES

A.

We first address defendant's contention that the trial judge erred in not excusing Juror Two after she revealed her daughter had visited her during the evening of the first day of trial wearing a sweatshirt memorializing Buckey – the victim. Defendant asserts the juror's observation of her daughter's sweatshirt and her knowledge of her daughter's connection to the victim constituted an "irregular influence" which had the "clear capacity" to impact the juror's ability to remain impartial.

34                                                A-3074-17T2

The Sixth Amendment to the United States Constitution and Article I, paragraph 10 of the New Jersey Constitution guarantee criminal defendants the right to an impartial jury during trial.  State v. R.D., 169 N.J. 551, 557 (2001). Criminal defendants are "entitled to a jury that is free of outside influences and [that] will decide the case according to the evidence and arguments presented in court in the course of the criminal trial itself."  State v. Williams, 93 N.J. 39, 60 (1983).

"The securing and preservation of an impartial jury goes to the very essence of a fair trial."  Ibid.  "[I]f during the course of the trial it becomes apparent that a juror may have been exposed to extraneous information, the trial court must act swiftly to overcome any potential bias and to expose factors impinging on the juror's impartiality."  R.D., 169 N.J. at 557-58 (citing State v. Bey, 112 N.J. 45, 83-84 (1988)).

Our Supreme Court recognizes that "the trial court is in the best position to determine whether the jury has been tainted."  R.D., 169 N.J. at 559.  The trial judge must "consider the gravity of the extraneous information in relation to the case, the demeanor and credibility of the juror or jurors who were exposed to the extraneous information, and the overall impact of the matter on the fairness

of the proceedings." Ibid. We review the court's determinations regarding juror taint for an abuse of discretion. Ibid.

The parties concluded jury selection on November 14, 2017. The judge advised the fourteen jurors they had been selected but since the case was not resuming until November 29, 2017, the judge did not administer the oath to the panel. Although the judge did not give the required preliminary juror instructions, he did tell the jury not to discuss with anyone anything they might have learned during the selection process and not to do any research regarding the case.

When the jury returned on November 29, the judge swore them in and gave the preliminary instructions and counsel gave their opening statements. The jury heard testimony from Queeson and another witness.

On November 30, the State produced Detective Rebiero and a lieutenant in the crime scene unit of the ECPO. When the court took a break later that morning, the judge asked Juror Two to stay behind. He advised counsel he had learned that Juror Two had left a voicemail the prior evening indicating she had received some information about the case. The judge and counsel then questioned the juror twice that day as set forth above. The judge did not excuse the juror on November 30 nor did he rule on defendant's request to do so. Juror

Two stayed for the rest of the day, hearing the testimony of three additional witnesses.

When the case convened five days later, on December 5, the judge denied defendant's application to excuse Juror Two. In doing so, the judge stated he found the juror credible in her assertion that she could be fair and impartial.

We are well aware of the deference accorded to a trial court's exercise of control over matters pertaining to the jury. And specifically, the trial judge's discretion to determine whether a juror can be fair and impartial and whether to excuse a juror for taint.

However, under the unique circumstances presented here, we are constrained to conclude that the judge erred in not excusing Juror Two. We cannot accept it was a complete coincidence for the juror's daughter to wear a sweatshirt memorializing the victim to her mother's home while her mother was serving as a juror on the panel which would determine the innocence or guilt of that victim's shooter. The context strongly suggests the daughter would be displeased if the jury on which her mother served returned a defense verdict – a displeasure that could affect their future relationship.

We equate these events to a situation where a juror discloses he or she knows the victim, the defendant or a witness or any family member of those

persons. This is a required question during the voir dire of all potential jurors so counsel and the parties can assess the impartiality of a juror. See Model Jury Selection Questions (Criminal), "Standard Jury Voir Dire" (rev. May 16, 2007).

As the Court stated in State v. Fortin, 178 N.J. 540, 629 (2004), "We think it ill-advised, as a general rule, to seat any juror who is acquainted with a murder victim's loved ones, no matter how convincingly that individual proclaims his or her ability to remain impartial." Although Fortin was a capital murder case, we think the Court's following sage comment universally holds true: "It is better to err in favor of removing a juror where there is evidence of potential partiality or bias, than to permit that juror to sit in judgment, leaving the fairness of a capital trial in doubt." Id. at 630.

Here, whether Juror Two personally knew the victim or not, her daughter or someone known to the daughter, had some connection to the victim to a degree that compelled the daughter to wear a memorial sweatshirt. That is more than sufficient reason to disqualify and excuse the juror. Defendant did not request a mistrial; he only asked the judge to excuse the juror. At the time, there

remained one alternate juror.[8] Neither the attorneys nor the judge expressed any concerns with seating the alternate juror.

Because Juror Two remained on the panel that deliberated to a verdict, her knowledge of her daughter's actions and potential connection to the victim had the capacity of influencing the jury in reaching its verdict. See Panko v. Flintkote Co., 7 N.J. 55, 61 (1951) (holding the test for whether a new trial should be granted because of an irregular influence is "not whether the irregular matter actually influenced the result, but whether it had the capacity of doing so"). We are convinced the failure to excuse the juror requires a new trial. Although we do not conclude any of defendant's remaining arguments require reversal, we address his contentions as guidance for the re-trial.

B.

Defendant argues the trial court failed to perform its gatekeeping function by overruling defense counsel's objection to the admission of David's expert testimony regarding drive testing without holding a N.J.R.E. 104 hearing to establish its reliability. This argument lacks merit.

---

[8] The other alternate juror had not returned when the panel convened on November 29.

A-3074-17T2

At the request of the State, David conducted a historical cell site analysis and drive test using defendant's cellphone records to ascertain the location of defendant's cellphone at the time of the shooting. He issued a report containing the details of his investigation, his conclusions of his analysis and attached maps corresponding to his findings.

Defendant did not challenge the report in any pre-trial application. There was no objection when the prosecutor told the jury in her opening statement that David would be testifying as an expert in the field of historical cell site analysis and would opine as to where defendant's "cellphone was around or at the time of the homicide." At trial, defense counsel accepted David as an expert in the field of historical cell site analysis and did not object to him testifying about that aspect of his report. However, counsel objected to any testimony about drive testing, stating it was "not a settled science[,]" "not a [reputable] science."

Counsel did not ask for a Rule 104 hearing or give any further reason for his objection. He stated: "I'll be guided by the [c]ourt's thoughts in this regard." The court admitted David as an expert in historical cell site analysis as there was no objection and added: "As far as anything else I'm going to take it as it comes."

There was no further objection during David's testimony regarding the drive testing. During direct examination, David acknowledged the limitations

40

to the drive test, including: (1) cell tower coverage could be impacted by signal strength and topography; (2) cell sites, antennae heights and orientations for the towers must be the same as they were at the time of the crime to conduct the test; (3) the scanner was designed to be driven down streets and had to use software for areas inaccessible by vehicle; (4) the test was conducted very close to the one-and-a-half-year limit for performing the test; and (5) a cellphone may not connect to the closest tower and several towers could handle one call.

Defense counsel questioned the expert extensively, eliciting concessions from David that he conducted the testing a year and a half after the shooting, and that he was unaware whether any buildings had gone up or come down in that timeframe.

Whether we review defendant's argument for plain error, as the State contends, or an abuse of discretion, as urged by defendant, we are satisfied it was not error for the court to allow David's testimony on drive testing. There was no objection pre-trial or during trial to David's testimony until after the State tendered him as an expert. Even then, defense counsel did not request a Rule 104 hearing and did not contest David's qualifications. He only stated that drive testing was not a "settled science." Counsel did not renew his objection, as invited by the judge, to provide any specific grounds and instead cross-examined

David on the basis for his opinions. Defendant did not present his own expert to dispute the reliability of drive testing.

As a result, on this record, we cannot properly consider defendant's argument on appeal which seeks a categorical determination on whether drive testing is reliable and accepted by the scientific community. As stated, under these circumstances, without an objection supported by specific grounds, the trial judge did not abuse his discretion in admitting David's testimony.

C.

We consider and reject defendant's assertion that the officers' failure to record statements he made while riding in the police car on April 25, 2014 violated Rule 3:17(a) and required the trial court to sua sponte charge Model Jury Charges (Criminal), "Statements of Defendant (When Court Finds Police Inexcusably Failed to Electronically Record Statement)" (approved Nov. 7, 2005). As defendant did not request the charge, we review his contention for plain error. R. 2:10-2.

Rule 3:17(a) requires custodial interrogations conducted in a place of detention to be electronically recorded when the person being interrogated is charged with certain crimes. A police vehicle is not included in the definition of a "place of detention." Ibid. Moreover, as the trial judge found, defendant's

statements to police were made voluntarily after he was advised of his <u>Miranda</u> rights. The police were not interrogating defendant; they had not asked him any questions at all. Defendant made the statements spontaneously.

Because there was no violation of <u>Rule</u> 3:17(a), there was no obligation for the court to instruct the jury regarding the effect of such a breach. In addition, defense counsel extensively questioned Detective Rebiero about defendant's statements and argued to the jury that Rebiero was not credible. The judge also instructed the jury it was its province to determine whether defendant made the statements attributed to him and to assess the credibility of the statements. He stated that in light of "the generally recognized risk of misunderstanding by the hearer or the ability of the hearer to recall accurately the words used by the defendant[,]" Rebiero's testimony regarding defendant's oral, unrecorded statements should be "receive[d], weigh[ed] and consider[ed] . . . with caution." And, "[i]f after consideration of all of these factors[,] you determine that the statements were not actually made, or that the statement or statements are not credible, then, you must disregard[] them completely."

D.

In the course of his testimony, Detective Muhammad told the jury he had learned from the "arresting detectives" that defendant said "he was in possession

of the weapon that he was arrested with . . . [s]ince January before the murder of Kyrie . . . up until the incident of Kyrie . . . . [The weapon was] [f]or his protection . . . [c]ause he had been shot." Defendant asserts this was impermissible hearsay used to bolster Rebiero's testimony. In addition, defendant asserts the testimony improperly attributed corroboration of defendant's statement to the other two arresting officers who did not testify at trial. Defense counsel did not object to the testimony.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." State v. Brown, 236 N.J. 497, 522 (2019) (citing R. 801(c)). Hearsay may not be admitted into evidence unless it falls within one of the exceptions provided by the rules of evidence or "other law." R. 802. "[I]f evidence is not offered for the truth of the matter asserted, the evidence is not hearsay and no exception to the hearsay rule is necessary to introduce that evidence at trial." State v. Long, 173 N.J. 138, 152 (2002) (citing State v. Chavies, 345 N.J. Super. 254, 274 (App. Div. 2001)).

In addressing a defendant's right to confront witnesses in the context of a police officer's hearsay testimony, our Supreme Court has stated it is permissible for a police officer to testify about "the course of [an] investigation" and the

reasons for approaching a suspect or investigating a crime scene when explaining it was done "upon information received." State v. Frisby, 174 N.J. 583, 592 (2002) (citing State v. Roach, 146 N.J. 208, 224-25 (1996)); State v Bankston, 63 N.J. 263, 268 (1973) (citation omitted). The explanation is admissible for the sole purpose of showing "the officer was not acting in an arbitrary manner or to explain his subsequent conduct." Bankston, 63 N.J. at 268 (citation omitted).

In considering such testimony, the key determinant is whether the hearsay testimony creates an "inescapable inference" that law enforcement received information from an unknown source that implicates a defendant. State v. Branch, 182 N.J. 338, 349 (2005) (quoting Bankston, 63 N.J. at 271). That is, "both the Confrontation Clause and the hearsay rule are violated when, at trial, a police officer conveys, directly or by inference, information from a non-testifying declarant to incriminate the defendant in the crime charged." Id. at 350 (citing Bankston, 63 N.J. at 268-69).

Muhammad's testimony is not inadmissible hearsay because it was not offered to prove the truth of the matter asserted, i.e. that defendant had the gun since January 2014. Instead, Muhammad's testimony was admitted for a permissible non-hearsay purpose to explain the course of the investigation and

to show how defendant became a suspect in the shooting. See Carmona v. Resorts Int'l Hotel, Inc., 189 N.J. 354, 376 (2007); Frisby, 174 N.J. at 592.

Muhammad testified he first learned in April 2014 that "someone had been arrested with a weapon [that was] used . . . in the demise of [Kyrie]." He then discovered defendant was the person arrested. The "arresting detectives" told him what defendant had said during his arrest, specifically that he had the gun "since January" because he had been shot.

Based on the information from the arresting officers, Muhammad investigated defendant's claim and "confirm[ed]" defendant had been shot in January 2012. As a result, Muhammad and other officers considered defendant a potential suspect based on his statements to police and they conducted further investigation into defendant's cellphone data, crime scene evidence and whether there were other individuals with potential information.

Therefore, because Muhammad's testimony here was offered to explain how defendant became a suspect, not to prove the truth of the contents, it was not hearsay or a violation of defendant's confrontation rights. Furthermore, the testimony had little impact as Rebiero told the jury about the statements defendant made while they were riding in the patrol car. Moreover, Muhammad was subject to cross-examination and, as stated above, the judge instructed the

46

jury it was their domain to determine whether defendant made the statements attributed to him and to assess the credibility of the statements.

## E.

Defendant raises an additional issue regarding Muhammad's testimony. He asserts the trial judge erred when he overruled his counsel's objection to hearsay testimony from Muhammad concerning the description of the assailants by Queeson and his son. Although we agree the testimony was impermissible hearsay, we are satisfied its admission was harmless error.

Muhammad testified that Queeson told him the assailants were "[t]all black male[s]" who wore dark clothing, including scarves and masks that obstructed their faces. He stated that Queeson's son gave the same description.

However, when Queeson testified, he described the suspect who shot Kyrie as "about five eight" and may have had braids. He did not testify to the other suspect's height because he was wearing a mask and Queeson "mostly saw him running away" after the shooting. Queeson also did not provide the race of either suspect; he only stated they were wearing black clothing and masks. Queeson's son did not testify at the trial.

We agree that Muhammad's testimony regarding the descriptions of the assailants provided by Queeson and his son was hearsay. However, we find the

47

admission of the testimony was harmless error as it did not have the capacity to produce an unjust result. Muhammad's testimony was subject to thorough cross-examination by defense counsel. In addition, Muhammad stated that neither Queeson nor his son identified defendant as an assailant.

F.

We next consider defendant's argument that the prosecutor made an improper "call to arms" in her closing argument that denied his right to a fair trial. He refers to the following comments: (1) defendant and his co-conspirator disguised themselves and took the weapons they used with them to leave Kyrie and his family "without justice"; and (2) by returning a guilty verdict, the jury had "the opportunity to provide justice in this case . . . to Kyrie . . . and his family and Queeson . . . ." As there was no objection during the closing argument, we review for plain error.

Prosecutors are "expected to make vigorous and forceful" summations, and they "are afforded considerable leeway" so long as their remarks are tethered to the evidence presented and the reasonable inferences to be drawn therefrom. State v. Frost, 158 N.J. 76, 82 (1999) (citing State v. Harris, 141 N.J. 525, 559 (1995); State v. Williams, 113 N.J. 393, 447 (1988)).

48

However, a prosecutor may not issue a call to arms – asking the jury to "send a message" to the defendant and the public, since such statements could "mislead a jury as to its role and duty," State v. Hawk, 327 N.J. Super. 276, 282-83 (App. Div. 2000) (citations omitted), "improperly divert jurors' attention from the facts of the case and intend to promote a sense of partnership with the jury that is incompatible with the jury's function," State v. Neal, 361 N.J. Super. 522, 537 (App. Div. 2003) (citations omitted), or "imply[] that jurors will violate their oaths if they fail to convict . . . ." State v. Pennington, 119 N.J. 547, 576 (1990).

Similarly, prosecutors also may not make emotional appeals that have the capacity to shift the jury's attention away from the evidence. State v. Black, 380 N.J. Super. 581, 594-95 (App. Div. 2005); State v. Lockett, 249 N.J. Super. 428, 434-35 (App. Div. 1991).

In determining whether to reverse a conviction for prosecutorial misconduct, including improper remarks during summation, we must decide whether "the prosecutor's misconduct was so egregious that it deprived the defendant of a fair trial." Frost, 158 N.J. at 83 (citing State v. Ramseur, 106 N.J. 123, 322 (1987); State v. Siciliano, 21 N.J. 249, 262 (1956)). A prosecutor's

remarks may be harmless if they are only a response to remarks by opposing counsel. State v. DiPaglia, 64 N.J. 288, 297 (1974).

If no objection is made, the prosecutor's conduct generally will not be deemed prejudicial, as the failure to object indicates counsel did not consider the conduct improper and deprives the trial judge of the opportunity to take curative action. State v. Echols, 199 N.J. 344, 360 (2009). Here, defense counsel did not object or request a curative instruction.

We are satisfied there was no impropriety in the prosecutor's comments. Defense counsel used the symbol of the "scales of justice" to argue the State had not met its burden of proof. He further asserted the State's case was "like a hand me down case" and defendant was entitled to more than "[h]and me down justice" because he was "guarantee[d] justice" like everyone else.

During her summation, the prosecutor responded to defendant's scales of justice theme. She argued defendant and his co-conspirator "disguised" themselves with masks and took the weapons they used with them to "go unapprehended," leaving Kyrie and his family "without justice." The prosecutor further told the jury that when defendant was not arrested and weeks went by after the shooting without repercussion, he became "confident" and walked the streets carrying his gun. She stated that all of the evidence presented against

defendant "gives you the opportunity to provide justice in this case," including defendant's possession of the gun connected by ballistics testing to the one used in the shooting, his statements to police and the text message sent immediately after the shooting.

The prosecutor's remarks were not an inappropriate call to arms because she did not imply the jurors would violate their oaths if they failed to convict, see Pennington, 119 N.J. at 576, or suggest the jury had a societal duty to convict, Hawk, 327 N.J. Super. at 282. Instead, the prosecutor urged the jury to reach a verdict based on the evidence.

Moreover, the trial court instructed the jury that remarks by counsel made in summation were not to be considered as evidence, the jury should determine the case based solely on the evidence, the State had the burden of proof and defendant was entitled to a presumption of innocence. See State v. Smith, 212 N.J. 365, 409 (2012) (holding a prosecutor's improper remarks made during summation can be cured so long as the trial court "clearly instruct[s] the jury that the remarks made . . . were not evidence, but argument"); see also State v. Loftin, 146 N.J. 295, 390 (1996) (citing State v. Manley, 54 N.J. 259, 271 (1969)) (accepting the presumption that juries follow a court's instructions).

## G.

Although we have vacated defendant's convictions in concluding he is entitled to a new trial due to the court's error in not excusing Juror Two, for completeness we briefly address defendant's contentions regarding his sentence. He argues his sentence is excessive because the trial court failed to properly find and weigh the N.J.S.A. 2C:44-1 factors and to explain its reasoning for imposing consecutive sentences. We disagree.

Our review of sentencing decisions is relatively narrow and is governed by an abuse of discretion standard. State v. Blackmon, 202 N.J. 283, 297 (2010). A sentence will be affirmed "as long as the trial court properly identifies and balances aggravating and mitigating factors that are supported by competent credible evidence in the record." State v. Lawless, 214 N.J. 594, 606 (2013) (quoting State v. Natale, 184 N.J. 458, 489 (2005) (citation omitted)).

We are satisfied there was sufficient evidence in the record to support the judge's findings on aggravating factors one, N.J.S.A. 2C:44-1(a)(1), three N.J.S.A. 2C:44-1(a)(3), six, N.J.S.A. 2C:44-1(a)(6), and nine, N.J.S.A. 2C:44-1(a)(9). There is no support for defendant's argument for the application of mitigating factor eleven, N.J.S.A. 2C:44-1(b)(11).

We also see no merit in defendant's assertion that the court erred in imposing consecutive sentences.  In his determination, the trial judge properly considered the Yarbough factors and found the murder of Kyrie and aggravated assault of Queeson were two different crimes against separate victims justifying consecutive terms.  Although defendant's conduct resulting in the convictions for the murder and aggravated assault occurred at the same time and location and could be considered a single incident of aberrant behavior, his conduct was directed at two different people and had separate consequences – Kyrie was killed and Queeson was severely injured.  See State v. Carey, 168 N.J. 413, 428 (2001).  Defendant committed two separate acts of violence which resulted in convictions for distinct crimes.  Because there were multiple victims, the court did not impermissibly double-count the nature and circumstances of the offense relevant to aggravating factor one in its consideration of the Yarbough factors.

For the reasons stated, we find the trial court erred in the determination not to excuse Juror Two – an error that violated defendant's right to an impartial jury and that requires a new trial.  We therefore vacate defendant's convictions and remand for a new trial.

Vacated and remanded for a new trial in accordance with this opinion.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3074-17T2